UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 2:11-cr-00068-MCE |
| Plaintiff, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| RAZHAN BROADNAX, | |
| Defendant. | |

----oo0oo----

On February 10, 2011, Defendant Razhan Broadnax ("Defendant" or "Broadnax") was charged with being a felon in possession of a firearm and ammunition on January 25, 2011, in contravention of 18 U.S.C. § 932(g)(1). On June 23, 2011, counsel for Broadnax filed a Motion to Suppress Evidence and Statements gained as a result of an alleged unconstitutional search of Defendant's property, and an unlawful seizure of his person as a result of that search. Defendant alleges that said search and seizure violated his rights under the Fourth Amendment, and he seeks an order suppressing all fruits of that constitutional violation.
///

1

Both Defendant and the government requested an evidentiary hearing in order to resolve contested issues of fact germane to the Court's determination as to whether any constitutional violation had occurred.  An evidentiary hearing was conducted over the course of two days on August 24, 2011 and August 29, 2011.  Evidence was presented from numerous witnesses, and the Court heard oral argument from both sides at the conclusion of the hearing.  Based on the totality of the circumstances and weighing the credibility and veracity of each witness, the Court makes the following Findings of Fact and Conclusions of Law.

**FINDINGS OF FACT**

1.  On the afternoon of January 25, 2011, an anonymous citizen informant called 911 disptach to report that he/she had observed what appeared to be a drug transaction involving both a silver-colored handgun and a green leafy substance that appeared to be marijuana.  The caller observed a black male adult siting in the driver's seat of a newer parked Chrysler Sebring parked on the street.  The caller described the black male along with the clothes he was wearing.  The caller further provided a license plate number for the vehicle.

2.  Police investigation made subsequent to the call revealed that the license plate matched a rental car obtained from Hertz by an individual Kimyatta Horton.  Ms. Horton's address was reported to be 2045 Fenmore Way in Sacramento, California.

///

3.   A records check on the Fenmore Way address revealed that officers had previously responded to that location some six months earlier to conduct a parole search involving Defendant Broadnax.  A criminal check on Broadnax reflected previous convictions for assault with a deadly weapon, sale of cocaine base, and sale of marijuana.

4.   Given the above information, Sacramento Police Officers Jeffrey Kuhlmann and Matthew McPhail responded to the 2054 Fenmore Way address in an attempt to locate the vehicle described by the citizen informant.  Three other officers, including Todd Bevins and Rachel Goodpastor, also responded.  A canine officer also arrived at the scene with his dog, and ultimately a police sergeant, Lai Lai Bui, responded as well.  The officers described the number of police who responded as consistent with safety concerns attendant to a call potentially involving a firearm.

5.   Officer Kuhlmann testified that he proceeded to knock on the door.  A black male adult answered whose physical description and clothing matched the information in that regard provided by the citizen informant.  The black male adult identified himself as Defendant Broadnax.  Officer Kuhlmann proceeded to engage Broadnax in conversation.  Although Broadnax's large frame initially blocked the doorway leading into the home, during the course of his discussion with the officers he turned and stepped aside.  Officer Kuhlmann and Officer Bevins both perceived that gesture as an invitation to enter the foyer of the home.

///
///
///

3

1  Officer McPhail, who originally was stationed to the side of the
2  residence when Officers Kuhlmann and Bevins went to the front
3  door, further described seeing Broadnax step aside and allow the
4  officers to enter the home.  The officers' testimony, then,
5  corroborated what Broadnax did in permitting entrance into the
6  home.  Officers Kuhlmann and Bevins further confirmed that
7  Broadnax never voiced any objection to them entering the
8  residence.  In addition, the officers denied drawing their
9  weapons despite their admission to being armed.
10        6.  Broadnax's version of his initial contacts with the
11 police stand in stark contrast to the officers' testimony as set
12 forth above.  He testified that the officers' weapons were drawn
13 and that he moved aside only to avoid being shot.  He further
14 testified that he specifically denied the officer's request to
15 enter the home, and states that the officers "pushed their way
16 through" anyway.  Broadnax also claimed that he told the officers
17 to leave once they did enter the home without his permission.
18        7.  Not only was Broadnax' testimony diametrically opposed
19 to the version of events offered by the officers, it also was at
20 odds with information he previously had himself provided.  As the
21 government established on Broadnax' cross examination, his
22 declaration submitted in support of the motion to suppress
23 contained no indication either 1) that the officers' weapons were
24 drawn; 2) that Broadnax specifically denied consent to the
25 officers when they asked to search his residence; or 3) that
26 Broadnax unequivocally told the officers to leave once they did
27 come into the house.
28 ///

Instead, that information was presented for the first time when Broadnax took the stand during the suppression hearing.

8.  Divergence between the officers' testimony and that provided by Broadnax continued with regard to their respective versions of the circumstances under which contact was made with Kimyatta Horton.  According to the officers, Broadnax told them that he did not live at 2045 Fenmore Way despite spending significant time there with his girlfriend, Ms. Horton, and their daughter Noglia Broadnax.  When asked about searching the house, the police claim that Broadnax stated he was uncomfortable giving permission to search the house because it was Ms. Horton's home.  The police then asked Broadnax to call Ms. Horton, which he did on his cellular telephone.  After briefly talking to Ms. Horton himself, the police state that Broadnax gave the phone to Officer McPhail, who by that time had moved to the front door area of the home.  Officer McPhail went outside and talked to Ms. Horton. McPhail claims he told her why the police had been summoned to her home.  In response to McPhail's request that Horton consent to the search of her home, he states that she replied "you do what you got to do."  When he confirmed to Ms. Horton his understanding that she had accordingly consented to search, Horton again reiterated to McPhail that the police should "do what you need to do."   Although no written permission to search the premises was obtained, and although no search warrant had been prepared, Officer McPhail construed the telephone conversation as oral consent.  The officers proceeded to search the residence on the basis of that consent.

///

5

1      9.  Defendant Broadnax, for his part, claims he called Horton to alert her to the fact that the police were present, and to relay his concern for their daughter Noglia's custody in the event he was arrested.  During the course of that conversation, according to Broadnax, Officer McPhail grabbed the phone out of his hands and went outside.

    10.  Kimyatta Horton denied that she ever gave Officer McPhail any permission, implied or otherwise, to search her home.  In fact, she testified that she unequivocally told McPhail that he did not have her consent to search.  She claims she reiterated that message to McPhail as many as three times during the course of their conversation.

    11.  Tia Henderson, a close friend of Kimyatta Horton's, testified in an attempt to buttress Horton's claim that she refused to consent to a search of her home.  According to Ms. Henderson, after she arrived at Horton's home to pick up her daughter, she called Horton to apprise her of the police's presence.  Henderson claims that the police asked her to request permission from Horton to search Horton's home.  Tia Henderson testified that Horton again declined to give that permission.  According to Henderson, she clearly communicated that denial to the police who could not have misunderstood her since they were "right in my face".

    12.  The Court found both the demeanor and the testimony of the officers to be very credible.  In fact, having heard testimony from numerous officers over the course of his tenure on the bench, the undersigned has rarely if ever observed a more credible, candid and courteous group of officers.

Their testimony consistently corroborated, in all significant details, both the version of accounts set forth by each individual officer and the written account contained within the incident report prepared in the aftermath of the search.

13. The defense witnesses, on the other hand, were not credible and the Court accordingly has discounted their testimony. First, as indicated above, Defendant Broadnax's account of what transpired, as reported in his live testimony, radically differed from the declaration he provided in support of the motion to quash at the time it was filed. The omission of such important details (including Defendant's alleged claim that the police had their guns drawn and his claim that he specifically told the officers twice that he refused their request to search the premises) is inherently incredible, and belies any rational explanation.

14. The Court further found Kimyatta Horton's testimony to be less than credible. In addition to her own affect on the stand, which was not believable in the Court's estimation, her testimony as her financial affairs was implausible. The lengthy time it took for Ms. Horton to arrive back at her residence, given her whereabouts at the time she became aware of the police's presence at her home, also undermined her credibility, particularly given Ms. Horton's professed interest in the status of her daughter, who was at home with Defendant at the time the police arrived at Horton's residence.

15. In addition, Kimyatta Horton's claim that she knew almost nothing about the details of a stolen 2003 Jaguar automobile found parked in her garage defied credibility.

7

1  Despite the fact that the vehicle had apparently been parked
2  there for several months, she claimed to not know the last name,
3  address or telephone number of a friend of hers who allegedly was
4  the owner.  Significantly, too, the fact that Ms. Horton could
5  face criminal and/or civil liability in conjunction with her role
6  in the disappearance of the car goes directly to her own bias and
7  interest in invalidating the results of the searched performed by
8  the officers on January 25, 2011, which resulted in discovery of
9  the stolen Jaguar.
10      16.  The Court further found Tia Henderson's testimony, with
11  its attempt to bolster Kimyatta Horton's less than believable
12  version of events, not credible.
13      17.  Officer McPhail's search of the residence at 2045
14  Fenmore Way revealed a fully-loaded .38 caliber Smith & Wesson
15  revolver found between the mattress and the box spring of the bed
16  in the master bedroom.  Also found in the same area was a clear
17  plastic bag containing three smaller bags of a green, leafy
18  substance he believed to be marijuana.  McPhail further found
19  another sandwich bag containing marijuana in a drawer also
20  located within the master bedroom.  Finally, McPhail found, in
21  plain view on the kitchen counter, a portable electronic scale of
22  the type he believed to be typically used for the measurement of
23  controlled substances for sale.
24      18. As already mentioned above, a stolen Jaguar vehicle was
25  discovered in the garage of the residence by Officer Bevins.
26  Defendant denied any knowledge of either the vehicle or the gun,
27  according to a statement he provided after acknowledging that he
28  understood his <u>Miranda</u> rights as provided by the officers.

8

Defendant did admit that the marijuana, along with a small amount of cocaine discovered during the course of a search on his person, was indeed his.  Broadnax was also found to be carrying more than $900.00 in cash.

19.  Officer McPhail testified that he spoke to Kimyatta Horton in person after she arrived at her home.  She gave McPhail permission to search the Chrysler Sebring.  The subsequent search revealed no firearms or drugs in the vehicle.

## CONCLUSIONS OF LAW

A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." United States v. Murphy, 516 F.3d 1117, 1120 (9th Cir. 2008), quoting United States v. Delgadillo-Velasquez, 856 F.2d 1292, 1298 (9th Cir. 1988)).  Consent constitutes one such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible."  Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  Whether consent was voluntarily given is "to be determined from the totality of all the circumstances." Id. at 227.  The following factors may be relevant to that determination: "(1) whether the defendant was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the defendant was notified that [he] had a right not to consent; and (5) whether the defendant had been told a search warrant could be obtained."

9

1  United States v. Jones, 286 F.3d 1146, 1152 (9th Cir. 2002),
2  citing United States v. Castillo, 866 F.2d 1071, 1082 (9th Cir.
3  1989).  Consent to a warrantless search may be conferred either
4  by the defendant himself or by another party who has joint access
5  or control over the property at issue.  United States v. Childs,
6  944 F.2d 491, 494 (9th Cir. 1991).

   Although defendant claims that the officers' initial entry into the house was illegal, and maintains that that illegal entry tainted everything that occurred thereafter, including the search of the home itself, in the Court's view the evidence does not support that proposition.  The officers consistently and credibly testified that Broadnax stepped aside in a gesture they all perceived as implied consent to enter the home.  The officers agreed that Broadnax did not object to their entering the house once they did so.  The officers also uniformly stated that their weapons were not drawn, and that at the time Broadnax gestured for them to enter, they were engaged in only preliminary conversation with no arrest or search being imminent.  The only evidence suggesting that Broadnax did not agree to the officers coming in comes from Broadnax himself, and his testimony, as stated above, is simply not credible.

   Credibility also weighs in favor of consent to search the house being conferred by Kimyatta Horton.  The testimony provided by Ms. Horton to the contrary (along with similar testimony given by Tia Henderson) was not believable.

///
///
///

10

As also set forth in the factual conclusions delineated above, Horton's testimony was not credible, both in its specifics and because of Ms. Horton's apparent bias in invalidating the results of the search. Officer McPhail, on the other hand, who obtained verbal consent to search the premises from Ms. Horton, was very credible.

## CONCLUSION

Given the foregoing, and for the additional reasons stated on the record at the conclusion of the evidentiary hearing on August 29, 2011, Defendant's Motion to Suppress (ECF No. 16) is DENIED. A further Status Conference is set in this matter for **September 29, 2011 at 9:00 a.m.** As set forth on the record, time under local code T4 (attorney preparation) was excluded between the August 29, 2011 conclusion of the evidentiary hearing at the September 29, 2011 status conference. The ends of justice served in grantng this request outweigh the best interests of the public and the defendants in a speedy trial.

IT IS SO ORDERED.

Dated: September 15, 2011

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

11